Receipt number AUSFCC-11417845

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CLOUDBURST CONSULTING GROUP, INC.; BIXAL SOLUTIONS, INC.; KHULISA MANAGEMENT SERVICES, INC.; LINC LLC; MAKING CENTS INTERNATIONAL; NUMARK ASSOCIATES, INC.; PANAGORA GROUP; *and* SSG-ADVISORS, LLC,<br>*Plaintiffs*,<br>v.<br>UNITED STATES OF AMERICA,<br>*Defendant*. | Case No. **26-1184 C** |

**COMPLAINT**

1. Plaintiffs are U.S. small businesses that built their companies entirely, or in significant part, around performing work for the federal government. Like thousands of other government contractors, Plaintiffs committed personnel, capital, and specialized expertise to projects the United States chose to undertake through competitively awarded contracts. That system depends on a basic premise: contractors can rely on the government to honor the contracts it awards and to comply with its contractual obligations when it brings those contracts to an end.

2. For years, Plaintiffs performed that role for the U.S. Agency for International Development (USAID) and the U.S. Department of State. Through their contracts, Plaintiffs supplied the expertise and operational capacity necessary to carry out U.S. foreign-assistance programs around the world, including programs addressing public health, economic development, democratic governance, humanitarian needs, and the rule of law. Plaintiffs hired

specialized workforces, entered subcontracts and other commitments, and devoted substantial institutional resources to performing the work the government had contracted with them to do.

3. Beginning in January 2025, the government abruptly revoked its commitments. Within weeks, USAID and the State Department suspended and then terminated thousands of foreign-assistance awards, including Plaintiffs' contracts, across nearly the agencies' entire foreign-assistance portfolios. Those actions eliminated tens of billions of dollars in previously awarded work and brought many longstanding federal programs to an immediate halt.

4. These were not ordinary contract-by-contract termination decisions. Agency officials did not meaningfully examine the particular contracts, consult the Contracting Officers and other personnel responsible for administering them, or assess the consequences of terminating individual projects. Instead, agency leadership and officials associated with the so-called Department of Government Efficiency (DOGE) directed terminations in enormous tranches, often relying on spreadsheets containing only skeletal information about each award and using standardized form notices to terminate hundreds or thousands of awards at once.

5. That process continued even after a federal district court enjoined the government's blanket suspension and termination of foreign-assistance awards as likely unlawful. The agencies then asserted that senior officials had individually reviewed the awards selected for termination. But the machinery of termination remained essentially the same: thousands of awards were terminated in rapid succession through substantially identical notices, often by officials who did not administer the contracts and sometimes through contradictory or facially erroneous communications. The circumstances alleged below belie any suggestion that each contract received the individualized consideration the government claimed.

6. The government's actions breached its contractual obligations to Plaintiffs.

Although the government possessed contractual authority to terminate Plaintiffs' contracts for convenience, that authority was not unlimited. It could not be exercised in bad faith, through an abuse of discretion, or as a pretext for accomplishing an improper purpose. Yet that is what occurred here: Plaintiffs' contracts were swept into an indiscriminate government-wide campaign to eliminate foreign-assistance awards as quickly as possible, without meaningful consideration of the contracts themselves or the consequences of terminating them.

7. The resulting harm has been devastating. Plaintiffs—all U.S. small businesses—lost hundreds of millions of dollars in contracted work, were forced to lay off employees, terminate subcontracts and vendor relationships, and dismantle programs and institutional capacity developed over years. For small businesses like Plaintiffs, the consequences of such wholesale government action do not end with a single cancelled project. Businesses that invest in specialized personnel and capabilities to meet federal needs must be able to rely on the government as a contracting partner. When the government terminates contracts *en masse* without regard to its contractual obligations—and then leaves contractors to suffer the resulting costs, lost profits, and damages to their businesses—that conduct undermines the stability and predictability on which a competitive federal contractor base depends.

8. Plaintiffs do not ask this Court to second-guess the government's policy choices about foreign assistance. They ask the government to answer for the contractual consequences of the choices it made. The United States chose to accomplish its objectives through binding procurement contracts with Plaintiffs, accepted the benefits of Plaintiffs' performance, and subjected itself to the obligations that accompany those contracts. Plaintiffs therefore bring this action under the Tucker Act and the Contract Disputes Act (CDA) to recover the amounts due to them as a result of the government's unlawful termination and breach of their contracts.

## JURISDICTION

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1491(a) and 41 U.S.C. § 7104(b)(1).

## PARTIES

10. Plaintiff Bixal Solutions, Inc. (Bixal) is a woman-owned small business incorporated in Virginia and headquartered in Fairfax, Virginia. Founded in 2001, Bixal is a mission-driven company that helps government agencies organize, share, and apply knowledge to advance their missions, providing knowledge management; monitoring, evaluation, and learning; organizational learning; technology; communications; and human-centered design solutions. For more than five years, Bixal supported the U.S. Agency for International Development in advancing its goals—delivering large-scale knowledge management, learning, communications, and digital services contracts. As of January 20, 2025, approximately 33.5% of Bixal's funding came from USAID.

11. Plaintiff Cloudburst Consulting Group, Inc. (Cloudburst) is a best-in-class women-owned small business with more than 20 years strengthening government programs in the United States and around the globe. Founded in 2005 and headquartered in the Washington, D.C. area, Cloudburst has worked in more than 70 countries delivering research, monitoring and evaluation, and technical assistance to build the capacity of governments and non-governmental organizations, and craft successful public-private partnerships. For the U.S. Agency for International Development (USAID), Cloudburst technical experts have worked in Africa, Asia, the Middle East, Europe and Eurasia, and Latin America and the Caribbean. As of January 20, 2025, approximately 34% of Cloudburst's funding came from USAID.

12. Plaintiff Khulisa Management Services, Inc. (Khulisa) is a Bethesda, Maryland-based professional services firm providing clients around the world with monitoring and

evaluation, research, learning (MERL), and information technology services. Khulisa's work largely focuses on the education, public health, democracy and governance, and social protection sectors. Khulisa's slogan, "Accurately Measuring Progress," reflects its focus on assisting clients to better monitor their own performance and measure the impact of their efforts on beneficiaries. As of January 20, 2025, over 90% of Khulisa's revenue came from USAID contracts.

13. Plaintiff LINC LLC (LINC) is a mission-driven small business founded in 2013 and headquartered in Washington, D.C., with regional hubs in Africa (Addis Ababa), Latin America (Mexico City), and Europe (Pristina). LINC is committed to supporting local organizations and actors leading their own development. LINC is a thought leader and partner to donors, civil society, and government on issues of localization, including locally led development, capacity strengthening, systems thinking, collective action, and monitoring, evaluation, research and learning. Working hand-in-hand with partners, LINC designs and implements programs, delivers training, and generates actionable evidence that drives smarter, more sustainable impact and donor accountability. In 2018, LINC was recognized as "USAID Small Business of the Year" by USAID's Office of Small and Disadvantaged Business (OSDBU) for innovative performance on prime contracts. In 2024, just prior to USAID terminations, LINC was awarded the *Inc. 5000* "Fastest Growing Companies" distinction. As of January 20, 2025, 99% of LINC's funding came from USAID-funded prime and sub awards, all of which were terminated.

14. Plaintiff Making Cents International (MCI) is a registered U.S. small business headquartered in Washington, DC, working to foster human potential and promote economic opportunity around the world. MCI employs evidence-based, market-driven approaches by working with the private sector to engage market actors throughout value chains; build

employable skills for youth and adults through relevant, demand-driven training, coaching, and mentoring; and create linkages between entrepreneurs and financial institutions. Since 1999, MCI has delivered services in more than 90 countries and implemented more than 140 projects for USAID, other bilateral and multilateral donors, foundations, companies, and NGOs valued at more than $90 million. As of January 20, 2025, approximately 92% of MCI's funding came from USAID.

15. Plaintiff NUMARK Associates, Inc. (NUMARK) is a Bethesda, Maryland-based energy and environmental consulting firm specializing in technical support, research, and management services to U.S. and international government and private sector clients. NUMARK's mission is to assist government and industry in protecting public health, safety and the environment and in providing reliable and affordable energy supplies and utilization technologies. The firm provides technical support services to nuclear regulatory authorities and to international development organizations worldwide. As of January 20, 2025, approximately 90% of NUMARK's funding came from USAID.

16. Plaintiff Panagora Group (Panagora) is a registered U.S. small business founded in 2011 and headquartered in Maryland. Panagora has worked in almost 70 countries to advance economic and social development through evidence-based policy and other decision-making, with a special focus on the health sector. Panagora provides comprehensive organizational capacity strengthening and monitoring, evaluation, and learning services that support U.S. government, partner government, private sector, and civil society planning and decision-making to improve health and other development outcomes. Panagora's mission is to "Make our World a Better Place for Good" and reflects its commitment to sustainable, multisectoral, locally owned

solutions. As of January 20, 2025, approximately 99% of Panagora's funding came from USAID.

17. Plaintiff SSG-Advisors, LLC (d/b/a Resonance) was founded in 2005 and is headquartered in Vermont. SSG-Advisors, LLC specializes in working with the public and private sectors to catalyze investment and innovation to help clients overcome complex business and development challenges. Throughout its over-20-year history, SSG-Advisors, LLC has developed over 70 private sector engagement strategies, and worked on more than 350 partnerships in over 60 countries. SSG-Advisors, LLC has served numerous clients, including bilateral donors, development banks, foundations, and private-sector companies. As of January 20, 2025, approximately 79% of SSG-Advisors, LLC's funding came from USAID.

18. The United States of America is a defendant pursuant to 28 U.S.C. § 1491.

## FACTUAL ALLEGATIONS

### A. USAID Historically Implements Foreign Assistance Programs Through Contracts with Implementing Partners

19. Until 2025, USAID was the primary agency that administered the U.S. government's foreign assistance programs. Congress funded these programs, providing billions of dollars each year for USAID to carry out a wide range of foreign aid activities, including for global health, economic assistance, promotion of democracy and the rule of law, disaster recovery, combatting drug trafficking, and more.

20. USAID accomplished the vast majority of its foreign assistance work through procurement contracts, grants, and cooperative agreements partnerships with private "implementing partners."

21. This lawsuit concerns only procurement contracts, and in particular, procurement contracts held by small businesses.

22. These procurement contracts were awarded and administered pursuant to the Federal Acquisition Regulation (FAR).

23. At the time the current Administration took office in January 2025, USAID had thousands of active contracts with implementing partners to carry out the agency's foreign aid programs, including the 33 contracts that are the subject of this action.

### B. USAID Executes a Mass, Agency-Wide Termination of Foreign Assistance Contracts Without Making Individualized Determinations

24. On January 20, 2025, President Trump issued an Executive Order claiming that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." Exec. Order 14,169, § 1, 90 Fed. Reg. 8619 (Jan. 20, 2025). He further asserted that "[i]t is the policy of the United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2.

25. On January 24, 2025, Secretary of State Rubio issued a memorandum "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID." Memorandum from the Secretary of State ¶ 1, 25 STATE 6828 (Jan. 24, 2025) (the "January 24 State Memo"), *Am. Federation of Gov't Emps. v. Trump*, No. 25-cv-352 (D.D.C.), ECF No. 20-1.

26. Secretary Rubio directed that "contracting officers and grant officers [must] immediately issue stop-work orders" for any "existing foreign assistance awards." *Id.* ¶ 7.

27. The same day, then-Senior Procurement Executive (SPE) at USAID, Jami Rodgers, issued a notice directing agency contracting and agreement officers to "immediately issue stop-work orders, [and] amend, or suspend existing awards." *Id.*

28. Also the same day, then-USAID Acting Administrator Jason Gray issued instructions to agency employees that, among other things, "immediately direct[ed] all contracting and agreement officers to issue stop-work orders or bilateral amendments, consistent with the terms of the relevant awards or agreements, until determinations are made following the review." USAID, Follow-Up Instructions for Implementing Executive Order *Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (the "Gray Instructions"), *Global Health Council*, ECF No. 57-3.

29. On January 26, 2025, Gray issued a clarification that included a directive for staff to refrain from external communications outside of communications necessary to implement the "pause." USAID Office of Inspector General, Advisory Notice, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* at 1 (Feb. 10, 2025) (quotation marks omitted). USAID, *Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid* (Jan. 26, 2025) (the "Gray Clarification"), *Global Health Council*, ECF No. 57-4.

30. Thereafter, USAID halted all disbursement of appropriated foreign assistance funding and issued Stop Work Orders (SWOs) to implementing partners.

31. USAID issued SWOs as form letters addressed to "Implementing Partners." The SWOs stated that they were issued "[i]n accordance with" Executive Order 14,169 and the January 24 State Memo and directed implementing partners to "immediately stop, cease, and/or suspend any work being performed under your respective funding agreement, including but not

limited to, a contract, task order, grant, cooperative agreement, or other acquisition or assistance instrument until further notice." The SWOs further stated, "[t]his action is taken in accordance with the applicable authority under your award, which may include FAR Clause 52.242-15 Stop-Work Order (or Alternate I), 2 C.F.R. § 700.14 (Award Suspension and Termination), the Mandatory Standard Provisions for Non-U.S. Nongovernmental Organizations, as appropriate, or other terms in the agreement related to suspension of activities."

32. In a declaration filed in a lawsuit on February 10, 2025, then-Acting Deputy Administrator Peter Marocco stated that USAID had "generally paused all expenditures in connection with foreign aid," for "both new programs … as well as existing ones." Decl. of Peter Marocco ¶ 28, *Am. Foreign Serv. Ass'n v. Trump* (*AFSA*), No. 25-cv-352 (D.D.C. Feb. 10, 2025), ECF No. 20-1; *see* Notice of Correction, *AFSA*, ECF No. 21 (similar).

33. Just as President Trump issued his Executive Order regarding foreign assistance on his first day in office, the President also issued an Executive Order that first day in office establishing the United States DOGE Service (DOGE). *See* Exec. Order 14,158, *Establishing and Implementing the President's 'Department of Governmental Efficiency'*, 90 Fed. Reg. 8441 (2025). DOGE teams were quickly embedded within USAID. On February 2, 2025, Elon Musk, who was the functional head of DOGE, posted on X that it is "[t]ime for [USAID] to die." @ElonMusk, X.com (Feb. 2, 2025), https://x.com/elonmusk/status/1886102414194835755. And on February 3, he posted that he had "spent the weekend feeding USAID into the wood chipper." @ElonMusk, X.com (Feb. 3, 2025), https://x.com/elonmusk/status/1886307316804263979.

34. Musk spread various false conspiracy theories about USAID to justify the mass termination of its awards. For example, Musk falsely claimed that only 10% of USAID funding reached local communities. In reality 10% of funds went *directly* to local organizations, but the

remaining funding went toward local communities *through* multilateral agencies and American organizations that received the funds from the government. *See* Rachel Bonnifield & Justin Sandefur, *No, 90 Percent of Aid Is Not Skimmed Off Before Reaching Target Communities*, Ctr. for Glob. Dev. (Feb. 3, 2025), https://perma.cc/34FQ-R8SE.

35. On February 6, 2025, Musk posted on social media that "[t]he money laundering [of USAID dollars] is done through several intermediaries."[1]

36. Musk also falsely claimed that USAID had funded a contract worth $50 million to provide condoms to Gaza. *See* Daniel Dale, *'Some of the Things That I Say Will Be Incorrect': Musk Backs Away from False Claim of $50 Million for Gaza Condoms*, CNN (Feb. 12, 2025), https://perma.cc/4VHA-DDAS.

37. Musk has continued to exhibit his animus toward former recipients of USAID funding since leaving the federal government. For instance, in June and July of 2026, Musk posted comments on X such as: "The reality is that money was being sent to corrupt politicians under the guise of aid!"[2]; and "Deaths in Africa DECREASED after USAID funding was cut, because they're no longer able to push for violent revolution to install leftist regimes!"[3]

38. Over the following weeks, USAID terminated awards *en masse*, including Plaintiffs' procurement contracts. By the end of February 2025, more than 85% of USAID's total awards—5,341 in total—had been terminated. Stephanie Nolen, *U.S.A.I.D. Cuts Threaten Polio, H.I.V., Malaria and Bird Flu Efforts*, N.Y. Times (Mar. 26, 2025), https://perma.cc/DFD8-SVBC.

[1] https://x.com/elonmusk/status/1887534216453263617.
[2] https://x.com/elonmusk/status/2069087335824699744.
[3] https://x.com/elonmusk/status/2071673460779041155?s=46.

39. The initial terminations took place as early as the end of January 2025, but most began in February 2025.

40. Several days later, USAID began terminating awards in large "tranches." The agency carried out four tranches of terminations from February 9, 2025 through February 12, 2025. USAID undertook these terminations despite having just announced the 90-day period to "[r]eview[] each foreign assistance program" under new guidelines. *See* January 24 State Memo § 3(a).

41. It appears that USAID undertook and accelerated these terminations in response to litigation seeking emergency relief against the suspensions and stop-work orders.

42. On February 9, 2025, USAID's then-SPE Jami Rodgers emailed USAID staff a list of awards marked for termination. Rodgers requested "[staff] support in taking action on these activities by issuing notices to [agency] partners." The email stated: "For your convenience, M/OAA Policy has drafted several templates to assist with this process." The email did not include a timeframe for completion of these terminations, nor did it state that the terminations should be processed with urgency.

43. On Monday, February 10, 2025, two grantees filed suit in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State* ("*AVAC*"), No. 25-cv-400 (D.D.C.), challenging the suspension of foreign aid. The next day, February 11, a larger coalition of grantees, cooperative agreement recipients, and contractors filed a complaint in *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.), and that same day they moved for a temporary restraining order and preliminary injunction. The court held a hearing on the TRO motion on February 12, 2025.

44. Before the court could act on the TRO, on or about Tuesday, February 11, 2025, SPE Rodgers sent a follow-up message (*see Global Health*, ECF No. 19-2) to USAID

Contracting and Agreement Officers informing them that "Agency leadership has asked that we move quickly to terminate the awards." The message included two tranches of awards slated for termination no later than February 11—that day—and another tranche slated for termination no later than February 12—the next day.

45. Rodgers' message also answered questions the agency had received, apparently in response to internal apprehension about the terminations. One question was whether the general counsel could provide "a formal written opinion confirming the Contracting & Agreement Officers are acting within their warrant authority in executing these terminations" and clarification that "COs/AOs will not be held personally liable if the Agency is later found to have acted arbitrarily or violated federal statutes, such as the Impoundment Act." Rodgers responded by stating that Contracting and Agreement Officers would be acting within their authority and could not be held personally liable. *See id.*

46. Other questions included "[u]nder whose authority … the Office of Acquisition and Assistance [is] terminating these awards" and "[w]hat should be used as the basis" for the terminations. Rodgers responded that the State Department had prepared an action memorandum for each tranche that provided blanket authorization for every termination within that tranche. Rodgers further stated that, "given the timeline for completing termination notifications … the termination notices do not need to contain termination process details." As authority for the terminations, Rodgers stated that the Acting USAID Administrator, Marco Rubio, "has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid." *See id.*

47. Consistent with this direction from SPE Rodgers, several Plaintiffs immediately received termination notices.

48. For example, after receiving no termination notices prior to February 10, 2025, Plaintiff Bixal received two termination notices on February 12, 2025. The content of notices was identical, and one is reproduced below:

USAID
FROM THE AMERICAN PEOPLE

**To:** [redacted]
Director of Contracts
Bixal Solutions Inc.
3050 Chain Bridge Road
Suite 305, Fairfax, VA 22030

**Subject:** Notice of Full Termination for Convenience

**Contract:** Task Order 7200AA22M00015 under contract number 47QRAD20D1074

**Date:** February 12, 2025

Dear Contractor,

In accordance with Executive Order 14169 Reevaluating and Realigning United States Foreign Aid, additional guidance provided by USAID in the January 28 communication to implementing partners, and the formal stop work notice issued on January 27, 2025, your contract has been reviewed for programmatic efficiency and consistency with United States foreign policy.

Contract No. 7200AA22M00015 is completely terminated under FAR clause 52.217-2 Cancellation Under Multi-Year Contracts (OCT 1997); FAR clause 52.249-6 Termination (Cost-Reimbursement) (May 2004), effective immediately, February 12, 2025 on Immediately stop all work, terminate subcontracts, and place no further orders except to the extent you or a subcontractor wish to retain and continue for your own account any work-in-process or other materials. Provide by electronic means similar instructions to all subcontractors and suppliers. Detailed instructions to follow.

Please confirm your receipt and agreement with this Termination Notice by completing and returning the acknowledgement below. Should you have questions concerning this letter, please contact me at [redacted]. We will follow up with further guidance as soon as possible.

Sincerely,

49. Plaintiff Cloudburst received an identical notice on February 11, 2025:

USAID
FROM THE AMERICAN PEOPLE

February 11, 2025

[redacted]
President and CEO
The Cloudburst Group
8400 Corporate Dr. Ste 550
Landover, MD 20785-2238

Subject: **Contract No. 7200AA23M00011 - DRG Learning, Evaluation and Research (LER III): Notice of Full Termination for the Government's Convenience**

Reference: President Trump's Executive Order (EO) on Revaluating and Realigning United States Foreign Aid and FAR 552.212-4 Alt 1

Dear [redacted]:

In accordance with Executive Order 14169 Reevaluating and Realigning United States Foreign Aid, additional guidance provided by USAID in the January 28 communication to implementing partners, and the formal stop work notice issued on January 28, 2025, your contract has been reviewed for programmatic efficiency and consistency with United States foreign policy.

Contract No. 7200AA23M00011 is completely terminated under clause FAR 552.212-4 Alt 1 (l) effective immediately, February 11, 2025. Immediately stop all work, terminate subcontracts, and place no further orders. Provide by electronic means similar instructions to all subcontractors and suppliers. Detailed instructions to follow.

Please confirm your receipt and agreement with this Termination Notice by completing and returning the acknowledgement below Should you have questions concerning this letter, please contact [redacted]at [redacted] or me at [redacted]. We will follow up with further guidance as soon as possible.

Sincerely,

50. Plaintiff MCI received a similar notice on February 12, the first page of which provided:

USAID
FROM THE AMERICAN PEOPLE

February 12, 2025

[redacted]
IDAMS Project Director
Making Cents International (MCI)
1050 Connecticut Ave. NW, #65470
Washington DC 20035

Subject: Contract/Task Order 7200AA20D00018/7200AA22F00016; Inclusive Development Activity for Mission Support (IDAMS) - Notice of Full Termination for Convenience

Reference: President Trump's Executive Order (EO) on Revaluating and Realigning United States Foreign Aid and FAR 52.249-6

Dear [redacted]

In accordance with Executive Order 14169 Reevaluating and Realigning United States Foreign Aid, additional guidance provided by USAID in the January 28, 2025 communication to implementing partners, and the formal stop work notice issued on January 27, 2025, your contract has been reviewed for programmatic efficiency and consistency with United States foreign policy.

Contract # 7200AA22F00016 is completely terminated under clause FAR 52.249-6 effective immediately, February 12, 2025. Immediately stop all work, terminate subcontracts, and place no further orders. Provide by electronic means similar instructions to all subcontractors and suppliers. Detailed instructions to follow.

Please confirm your receipt and agreement with this Termination Notice by completing and returning the acknowledgement below. Should you have questions concerning this letter, please contact [redacted]@usaid.gov or me at [redacted]@usaid.gov. We will follow up with further guidance as soon as possible.

Sincerely,

51. On February 13, 2025, the district court in *Global Health Council* and *AVAC* issued a temporary restraining order. *Global Health Council*, ECF No. 21.[4] The court found the

[4] Although the cases were not formally consolidated, the proceedings were coordinated and the Court's orders on each docket generally applied to all parties in both cases.

plaintiffs were likely to succeed on the merits because, among other reasons, "the stated purpose in implementing the suspension of all foreign aid [was] to provide the opportunity to review programs for their efficiency and consistency with priorities," but "Defendants ha[d] not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs." *Id.* The TRO prohibited USAID from, *inter alia*, "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *Id.* at 14.

52. Several days later, the *AVAC* plaintiffs filed a motion to enforce, alleging that the government was not complying with the TRO. *AVAC*, ECF No. 26. In granting the motion in part, the district court explained that "[t]he TRO [did] not preclude Defendants from undertaking a good-faith, individualized assessment of a contract or grant and, where the terms or authority under law allows, taking action with respect to that particular agreement consistent with any procedures required." *Global Health Council*, ECF No. 28 at 6. But the court emphasized that the TRO did not permit the agencies to "simply replace their earlier implementations with other directives to their agencies to suspend, pause, or prevent the obligation or disbursement of appropriated foreign-assistance funds or issue, implement, enforce, or otherwise give effect to terminations, suspensions, or stop-work orders as to programs in existence as of January 19, 2025." *Id.* at 5–6 (cleaned up).

53. Nevertheless, on February 23, 2025, SPE Rodgers circulated another tranche of terminations and directed Contracting Officers to an FAQ dated February 20, 2025, which

referred to the Executive Order, notwithstanding that the Executive Order had been enjoined in *AVAC* and *Global Health Council*. The FAQ stated: "The termination authority is delegated to the Senior Procurement Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid."

54. The plaintiffs' counsel in *Global Health Council* thereafter alerted the government that this directive violated the temporary restraining order. *Global Health Council*, ECF No. 42 at 8–9.

55. At this point, the agencies suddenly shifted strategies and began claiming that the terminations were being undertaken pursuant to an individualized review process, in an effort to take advantage of the carve-out provided for in the temporary restraining order.

56. Immediately after *Global Health Council* plaintiffs' counsel alerted the government that the next tranche of terminations would violate the TRO, USAID Industry Liaison Matthew Johnson sent an email stating that the prior guidance from SPE Rodgers on February 23, 2025 was retracted and that, "[f]or the avoidance of doubt, Tranche 5 termination authority has no relationship to any Executive Order. These awards were individually reviewed by Secretary Rubio and the USAID Front Office and were determined to be inconsistent with the national interest and Agency priorities." *Global Health Council*, ECF No. 42-1 ¶ 26.

57. The email continued: "Accordingly, USAID has elected to enforce termination authorities in the relevant instruments." *Id.* ¶ 28. Then, for the first time, USAID alleged that "Secretary Rubio has individually reviewed Tranches 1-4 and made similar determinations in his capacity as Acting Administrator of USAID." *Id.*

58. The next day, February 24, 2025, USAID Senior Technical Advisory Adam Cox sent an internal email stating that he and the remaining Contracting Officers in Washington had "been instructed by DOGE and Jami [Rodgers] to terminate several awards tonight, so you may see some awards of yours that have been terminated. You should be CC'd on any emails that are going out. This of course will have to be officially done later in time through a GLAAS [Global Acquisition and Assistance System] action from someone [else] in the Mission/Region covering that portfolio, but I wanted to give you a heads up." *Id.* ¶ 32. The email continued: "There are MANY more terminations coming, so please gear up!" *Id.*

59. From February 24 to February 26, 2025, USAID terminated roughly 2,000 awards, including numerous procurement contracts with Plaintiffs.

60. On information and belief, the thousands of termination notices issued on these three days were all identical or substantially similar. An example of the termination notices sent on these days is the following termination received by Plaintiff Panagora Group:

USAID
FROM THE AMERICAN PEOPLE

**February 26, 2025**

**To:** PANAGORA GROUP INC.

**Subject:** Termination Notice of Award No. 72051423F00001

Dear Implementing Partner,

This award is being terminated for convenience and the interests of the U.S. Government pursuant to a directive from U.S. Secretary of State Marco Rubio, in his capacity as the Acting Administrator for the U.S. Agency for International Development ("the Agency" or "USAID") and/or Peter W. Marocco, who is performing the duties and functions of both Deputy Administrators for USAID. Secretary Rubio and PTDO Deputy Administrator Marocco have determined your award is not aligned with Agency priorities and made a determination that continuing this program is not in the national interest. The decision to terminate this individual award is a policy determination vested in the Acting Administrator and the person performing the duties and functions of the Deputy Administrator.

I have been delegated authority to issue this termination notice.

Detailed instructions will follow, and a formal modification/amendment to memorialize this action is forthcoming. . Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors.

Kindly confirm receipt of this Termination Notice via electronic email response to the sender.

Sincerely,

61. The termination notice did not even state which official gave which directive to terminate the award; the notice stated that the termination was "pursuant to a directive from U.S. Secretary of State Marco Rubio . . . *and/or* Peter W. Marocco" (emphasis added).

62. The termination notice was not even specific to procurement contractors. The letter, in addition to stating that the termination was for convenience, said that it was because the award was not consistent with "agency priorities" or the "national interests," which are the

standard for terminating grants and cooperative agreements, not procurement contracts. USAID, in other words, used a template that would be sent to both procurement contractors and grantees, even though those instruments are governed by completely different regulations and legal regimes.

63. The Contracting Officers were often not copied on, or contemporaneously informed of, these termination notices. For example, a Contracting Officer overseeing one of SSG-Advisors, LLC's contracts did not learn about its termination until SSG-Advisors, LLC informed him.

64. On March 6, 2025, SPE Rodgers directed USAID Contracting Officers and Agreement Officers to immediately review a list of terminated awards for which "expedited notices" had been issued and "issue [] detailed, expanded termination notice[s]" using templates linked in the email. *AVAC*, ECF No. 55-1 at 1. Rodgers directed that "[e]ach template must be tailored to the specific award and implementing partner, referencing the relevant clauses or provisions within the award." *Id.* at 2. He stated that the "templates [we]re designed to ensure consistent … communication between USAID CO/AOs and implementing partners following terminations." *Id.*

65. USAID executed many more contract terminations in the days that followed. Upon information and belief, these termination letters were identical to the letters sent between February 24 and 26.

66. Plaintiff NUMARK, for instance, received a termination notice for one of its contracts on March 11, 2025. The termination letter stated:

USAID
FROM THE AMERICAN PEOPLE

To: [redacted]
NUMARK ASSOCIATES, INC
[redacted]@numarkassoc.com

Subject: Termination Notice of Award No. 72048620F00003

Date: March 11,2025

Dear Implementing Partner:

This award is being terminated for convenience and the interests of the U.S. Government pursuant to a directive from U.S. Secretary of State Marco Rubio, in his capacity as the Acting Administrator for the U.S. Agency for International Development ("the Agency" or "USAID") and/or Peter W. Marocco, who is performing the duties and functions of both Deputy Administrators for USAID. Secretary Rubio and PTDO Deputy Administrator Marocco have determined your award is not aligned with Agency priorities and made a determination that continuing this program is not in the national interest. The decision to terminate this individual award is a policy determination vested in the Acting Administrator and the person performing the duties and functions of the Deputy Administrator

I have been delegated authority to issue this termination notice.

Detailed instructions will follow, and a formal modification/amendment to memorialize this action is forthcoming. Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors.

Kindly confirm receipt of this Termination Notice via electronic email response to the sender.

Sincerely,

67. Also on March 11, 2025, Plaintiff LINC received an identical notice of termination for its Contract No. 72066322C00001, which was signed by a USAID official who was not the warranted Contracting Officer overseeing this contract:

USAID
FROM THE AMERICAN PEOPLE

EXHIBIT #1

To: [redacted]
LINC LLC
[redacted]@linclocal.org

Subject: Termination Notice of Award No. 72066322C00001

Date: March 11,2025

Dear Implementing Partner:

This award is being terminated for convenience and the interests of the U.S. Government pursuant to a directive from U.S. Secretary of State Marco Rubio, in his capacity as the Acting Administrator for the U.S. Agency for International Development ("the Agency" or "USAID") and/or Peter W. Marocco, who is performing the duties and functions of both Deputy Administrators for USAID. Secretary Rubio and PTDO Deputy Administrator Marocco have determined your award is not aligned with Agency priorities and made a determination that continuing this program is not in the national interest. The decision to terminate this individual award is a policy determination vested in the Acting Administrator and the person performing the duties and functions of the Deputy Administrator

I have been delegated authority to issue this termination notice.

Detailed instructions will follow, and a formal modification/amendment to memorialize this action is forthcoming. Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors.

Kindly confirm receipt of this Termination Notice via electronic email response to the sender.

Sincerely,

68. That same day, LINC received a second letter that was signed by the warranted Contracting Officer overseeing this contract. This letter, however, confirmed the lifting of a previous termination of the contract and directed LINC to *resume performance* of the contract:

USAID
FROM THE AMERICAN PEOPLE

EXHIBIT #2

March 11, 2025

[redacted]
Technical Director CLA
LINC LLC
1201 Connecticut Avenue NW, Suite 200J
Washington, DC 20036
E-mail: [redacted]@linclocal.org

**Subject:** Revised Cancellation of Stop-Work Order Dated January 29, 2025

**Reference:** USAID/Ethiopia Resilience Learning Activity; Contract No. 72066322C00001

Dear [redacted]

As the result of a review conducted by Department of State and USAID leadership, you are hereby directed to resume work on the referenced contract. This notice follows the pause identified in USAID's January 28, 2025 communication to implementing partners, the Stop-Work Order and Award Suspension Notice 2, dated January 29, 2025, the termination notice dated February 12, 2025, and the rescission of the termination dated March 7, 2025.

You are hereby directed to resume performance in accordance with the terms and conditions of the above-referenced contract. In the case of need for adjustment to the schedule, deliverables, or other terms of the contract, please provide additional details to me as soon as possible and in accordance with the stop-work order clause applicable to your contract. In the event that you are unable to resume work following this notice, please provide those reasons in writing to me by March 14, 2025 and include a description of the steps that would need to be taken in order to resume implementation.

Should you have questions concerning this notice, please contact me at [redacted]@usaid.gov and copy [redacted]@usaid.gov.

Sincerely,

69. These conflicting letters were signed and delivered the same day for the same contract by different USAID officials.

70. It is wholly implausible that Acting USAID Administrator, Peter Marocco, other agency leaders, or DOGE individually reviewed thousands of contract terminations in February and March of 2025. Procurement contracts are long, technical, and complicated documents. They often include technical specifications that are dozens of pages long, as well as lengthy technical appendices. And to understand all the work to be done under a given award, one would typically need to review the solicitations and bids that led to the contract's issuance. It would take a single person many weeks of work to substantively review hundreds—let alone thousands—of such contracts, especially if that person was not already familiar with the programs at issue. *Global Health Council*, ECF No. 42-1 ¶ 36; *see also AVAC*, ECF No. 26-3 ¶ 49.

71. Further, without consulting the Contracting Officers or Contracting Officer's Representatives (CORs) who manage a specific contract—or the implementing partners themselves—it would be impossible in most cases to understand whether a specific contract could be terminated, effective immediately, without incurring even greater termination costs or causing harm to the national interest or agency priorities.

72. For example, the Contracting Officers and CORs have specific information about the status of ongoing work, whether immediate termination would incur sunk costs (for example, by allowing already-purchased food and medicine to expire), and whether immediate termination would risk the health or safety of agency personnel or implementing partners, among many other award-specific factors.

73. In contrast, then-Acting Deputy Administrator Peter Marocco described the "review process" as involving a cursory review of a spreadsheet, with a single line of data per

award that "included information about the recipient, the amount of the award, the subject matter, and a description of the project that *often*"—i.e., not always—"included the location of the project." *Global Health Council*, ECF No. 39-1 at ¶ 5 (emphasis added).

74. USAID thus was terminating and suspending hundreds of millions of dollars in contracts based on a one-line summary, without looking at the contract documents themselves, without consulting the personnel who manage the project and understand its policy objectives, and without considering the impacts that would come from terminating it. In many cases, the DOGE personnel or agency leaders who ordered the terminations did not even know the location of the project.

75. On March 10, 2025, the district court in *Global Health Council* and *AVAC* granted in part the plaintiffs' motion for a preliminary injunction. As relevant here, the district court held that the plaintiffs were likely to succeed on their claims that the initial agency actions implementing a blanket suspension of awards, pursuant to the President's Executive Order, were arbitrary and capricious. *Global Health Council*, ECF No. 21 at 21–24. The court held that the government's stated "desire to review programs for efficiency or consistency, and to access information in one place, does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid." *Id.* at 22. And the court rejected the government's contention that "the funding freeze was not 'comprehensive or undifferentiated' because the Secretary of State approved certain waivers." *Id.* at 23.

76. The district court denied the plaintiffs' request that the court also vacate the mass terminations that had occurred after the court entered its TRO on February 13, 2025. The court explained that the plaintiffs had "opted to rely on their initial TRO motions at the preliminary injunction stage," and accordingly "their opening motions [did] not address the post-TRO

landscape, and their arguments were limited to their reply briefs and oral argument." *Id.* at 26. The court acknowledged the plaintiffs' arguments that the purported individualized review process was a sham and merely a pretext for effectuating the blanket suspensions and terminations that were subject to the TRO. *Id.* at 26–27. But the court "[did] not reach the merits of these arguments," *id.* at 27, because the court tentatively concluded that the plaintiffs had not shown, on the record presented, that the mass terminations arose from the same initial agency directives implementing the blanket suspensions. "To be sure," the court recognized, "Plaintiffs may be able to formulate some new challenge to Defendants' process leading to these later terminations, whether in an [Administrative Procedure Act] claim premised on the relevant action or a contractual challenge based on the terms of individual awards." *Id.* at 27 n.11.

77. The court preliminarily enjoined the government from "giving effect to any terminations, suspensions, or stop-work orders issued between January 20, 2025, and February 13, 2025," the latter date being when the district court had entered its TRO. *Id.* at 47–48.

78. Additionally, even though the district court had prohibited the government from "'giving effect to any terminations' issued prior to February 13, 2025," USAID did in fact give effect to such terminations and did not undertake new terminations for many contracts that were terminated prior to that date.

79. For other contracts terminated prior to February 13, 2025, USAID purported to "effectuate" the pre-February 13 terminations by ratifying them, even though the preliminary injunction precluded the agency from "giving effect" to those terminations. The official performing the duties of USAID Deputy for Policy and Programming and Chief Operating Officer approved an Action Memo "to effectuate" 462 contract, grant, and cooperative agreement terminations issued prior to February 13. *Global Health Council*, ECF No. 97-2 at 1,

3. USAID's Chief Acquisition Officer then directed staff "to effectuate the terminations of awards issued prior to February 13, 2025." *Global Health Council*, ECF No. 97-3. For many of these awards, USAID issued new termination notices ratifying the earlier termination, maintaining the initial, pre-February 13 effective date for the terminations.

80. For instance, Bixal's contract for SERVIR Support Services (No. 7200AA22M00015/47QRAD20D1074) was terminated on February 12, 2025, and USAID later issued a follow-on termination notice that purported to give effect to the February 12 termination.

81. Plaintiffs in *Global Health Council* moved to enforce the preliminary injunction, and the district court granted the motion in relevant part, explaining: "The Court's preliminary injunction did not include any exception for Defendants to evade its terms through post hoc explanations for terminations, and the Court has previously rejected similar attempts by Defendants. … Defendants may not give effect to terminations issued prior to February 13, 2025, and must promptly take steps to come into compliance as to the awards at issue." *Global Health Council*, ECF No. 107 at 8–9. But, on information and belief, the agencies never took steps to come into compliance, and the effectively ratified terminations remain in place.

82. On information and belief, DOGE and agency personnel prepared, and the Acting USAID Administrator or other agency officials approved, an action memorandum for each tranche of award terminations. On information and belief, none of the action memoranda provided individualized information about the awards selected for termination.

83. On information and belief, the action memoranda state that tranches of awards were selected for termination for programmatic reasons described at a high level of generality—for example, because the awards related to "democracy promotion."

84. On information and belief, these action memoranda state that terminating the selected awards will result in cost savings and will save taxpayers money.

85. On information and belief, agency personnel prepared a spreadsheet listing the awards selected for termination, which was attached to each action memorandum.

86. On information and belief, the spreadsheets listing awards selected for termination did not include substantial information concerning the content, scope, or location of the programs at issue; nor did the spreadsheets identify any potential reliance interests that would be upended, nor any costs or other adverse effects that would arise, if the awards were terminated.

**C. USAID Suspends and Then Terminates Plaintiffs' Contracts**

87. Across the eight Plaintiffs in this action, USAID terminated approximately 33 procurement contracts, listed below. The lists below do not include terminated indefinite delivery/indefinite quantity contracts under which some of Plaintiffs' task orders were issued.

*Bixal*

88. In January 2025, Bixal was serving as the prime recipient of seven USAID contracts. USAID issued SWOs for each of these contracts between January 24 and January 28, 2025 and terminated the contracts beginning on February 12, 2025.

89. Bixal's terminated contracts are:

a. SERVIR Support Services, 7200AA22M00015
b. Uganda MEL, 72061724F00001
c. Laos MEL Support, 72043924F00002
d. Ghana CREATES Activity, 72062424F00001
e. Libya MEL Activity, 72067021F00001
f. Nepal Learning for Development, 72036723N00002

g. ESC MEL Services Activity, 72053822F00001

*Cloudburst*

90. In January 2025, Cloudburst was serving as the prime recipient of one USAID contract. USAID issued an SWO for the contract on January 28, 2025, and issued termination notices for the contract on February 11, 2025.

91. Cloudburst's terminated contract is:

a. Democracy, Governance, and Human Rights (DRG); Learning, Evaluation and Research (LER III), 7200AA23M00011.

*Khulisa*

92. In January 2025, Khulisa was serving as the prime recipient of two USAID contracts. USAID issued SWOs for each of these contracts on January 25 and January 27, 2025 and terminated the contracts beginning on February 12, 2025.

93. Khulisa's terminated contracts are:

a. Scaling Up Nutrition Learning and Evaluation (SUN LE), 72061119C00003

b. Peace through Evaluation, Learning, and Adaptation II (PELA II), 72062422F00001

*LINC*

94. In January 2025, LINC was serving as the prime recipient of six USAID contracts. USAID issued SWOs for each of these contracts between January 24 and January 27, 2025 and terminated the contracts beginning on February 26, 2025.

95. LINC's terminated contracts are:

a. Ethiopia RLA, 72066322C00001

b. Ghana MEL, 72064122F00005

c. Mexico MESA, 72052322F00003

d. PLR LEES, 7200AA23F00010

e. Georgia CCLA, 72011425C00001

f. Kenya IGAPP Evaluation, 72061523F00001

*MCI*

96. In January 2025, MCI was serving as the prime recipient of one USAID contract. USAID issued an SWO for the contract on January 27, 2025 and terminated the contract on February 12, 2025.

97. MCI's terminated contract is:

a. Inclusive Development Activity for Mission Support (IDAMS), 7200AA22F00016

*NUMARK*

98. In January 2025, NUMARK was serving as the prime recipient of two USAID contracts. USAID issued SWOs for each of these contracts on January 25, 2025 and terminated the contracts on February 26 and March 11, 2025.

99. NUMARK's terminated contracts are:

a. Laos Energy Security Activity (LES), 72048620F00003

b. Pakistan Power Sector Improvement Activity (PSIA), 72039121F00005

*Panagora*

100. In January 2025, Panagora was serving as the prime recipient of five USAID contracts. USAID issued SWOs for each of these contracts between January 24 and January 28, 2025 and terminated the contracts beginning on February 11, 2025.

101. Panagora's terminated contracts are:

a. Colombia Monitoring, Evaluation and Learning Short-Term Activity (MELSA), 72051423F00001

b. Indonesia Monitoring, Evaluation, and Learning Platform (MEL-P), 72049720Q00001

c. Strengthening Transformative and Equitable Partnerships (STEP) Activity, 7200AA24F00009

d. Southern Africa Technical Support Services (TSS), 72067419C00001

e. Localize Global Health Security (LGHS) Activity, 7200AA23C00056

*SSG-Advisors, LLC*

102. In January 2025, SSG-Advisors, LLC was serving as the prime recipient of nine USAID contracts and two cooperative agreements that are relevant to this litigation. USAID issued SWOs or suspension notices for most of these procurement contracts and cooperative agreements, and termination notices for each of them, between January 22 and February 18, 2025.

103. SSG-Advisors, LLC's terminated procurement contracts and cooperative agreements are:

a. Maintaining Private Sector Engagement in Humanitarian Programming (MAPS-H), 7200AA21C00053

b. MAP BPA Bureau for Strategic Communications/International Communications (LPA) Call Order, 7200AA23F50032

c. MAP BPA DEIA Call Order, 7200AA22A00005/7200AA22F50016

d. MAP BPA Bureau for Asia Change Management Retreat/Asia Call Order, 7200AA22A00005/7200AA24F50039

e. MAP BPA Operational Performance Improvement (OPI) Call Order, 7200AA22A00005/7200AA24F50040

f. MAP BPA Iraq Change Management Call Order, 7200AA22A00005/7202674F50002

g. MAP Laos Program Office Consultant Call Order, 7200AA22A00005/72043924F50002

h. USAID/BER-IKAN Activity, 72049722C00001

i. USAID Digital Economy and Market Development (DEMD), 7200AA19M00016

j. Investing in Women to Strengthen Value Chains, 7200AA20CA00001

k. The CIRCLE Alliance: Catalyzing Inclusive, Resilient, and Circular Local Economies, 7200AA24CA00003

**D. The Government Owes Plaintiffs Significant Sums for Unpaid Invoices**

104. USAID has failed to pay properly submitted invoices and has failed to pay interest on late-paid invoices for such costs.

105. The Prompt Payment Act requires the government to pay invoices 30 days after they are received, 31 U.S.C. § 3903(a)(1)(B), and provides a goal of paying small businesses in an accelerated timeline of 15 days, *id.* § 3903(a)(10).

106. The government must pay an interest penalty on invoices paid more than 30 days after the invoice is received. *Id.* § 3902(b). Interest compounds every 30 days. *Id.* § 3902(e). The government is subject to further penalties if it pays a late invoice but not the accrued interest. *Id.* § 3902(c)(3); 5 C.F.R. § 1315.11.

107. Many of the contracts at issue in this case were cost reimbursement contracts. Under the terms of those contracts, USAID was required to reimburse Plaintiffs for allowable costs and (as relevant) portions of the fixed fee upon the receipt of proper invoices.

108. Additionally, even for contracts that are not cost-reimbursable, such as Time & Materials and Fixed Price contracts, allowable costs incurred during a stop-work order period or during termination are reimbursable upon receipt of a proper invoice.

109. Plaintiffs SSG-Advisors, LLC, Bixal, and LINC have submitted to USAID invoices for costs arising from work performed either before their contracts were terminated or during the SWO or termination period that USAID has failed to pay.

110. SSG-Advisors, LLC has submitted invoices for pre-termination costs on five of its procurement contracts and cooperative agreements: (1) MAP BPA DEIA Call Order, 7200AA22A00005/7200AA22F50016; (2) MAP BPA OPI Call Order, 7200AA22A00005/7200AA24F50040; (3) MAP BPA Iraq Change Management Call Order, 7200AA22A00005/7202674F50002; (4) USAID/DEMD 7200AA19M00016; (5) Investing in

Women to Strengthen Value Chains, 7200AA20CA00001. SSG-Advisors, LLC has also submitted invoices for true-ups on indirect costs associated with four of its procurement contracts: (1) USAID/DEMD 7200AA19M00016; (2) MAP BPA Iraq Change Management Call Order, 7200AA22A00005/7202674F50002; (3) USAID/BER-IKAN Activity, 72049722C00001; (4) MAP Laos Program Office Consultant Call Order, 7200AA22A00005/72043924F50002. USAID has not paid or responded to any of the above invoices, even though they have been outstanding for more than 30 days. These invoice costs were included in SSG-Advisors, LLC's TSPs for the relevant procurement contracts and, therefore, the corresponding CDA claims.

111. Bixal has submitted three invoices for pre-termination costs that are also included in Bixal's TSPs and corresponding CDA claims for the procurement contracts. The invoices related to unpaid pre-termination costs for the following procurement contracts: (1) Nepal Learning for Development, 72036723N00002; (2) Laos MEL Support, 72043924F00002; (3) ESC MEL Services Activity, 72053822F00001. Bixal has also submitted invoices for unpaid true-up costs relating to the following procurement contracts: (1) SERVIR Support Services, 7200AA22M00015; (2) Uganda MEL, 72061724F00001; (3) ESC MEL Services Activity, 72053822F00001; (4) Ghana CREATES Activity, 72062424F00001; and (5) Libya MEL Activity, 72067021F00001. USAID has not paid or responded to any of the above invoices, even though they have been outstanding for far more than 30 days. These invoice costs were included in Bixal's TSPs for the relevant procurement contracts and, therefore, the corresponding CDA claims.

112. LINC submitted an invoice for pre-termination work related to one of its contracts, Kenya IGAPP Evaluation, 72061523F00001. USAID has not paid the invoice, even

though it has been outstanding for far more than 30 days. The invoice cost was included in LINC's CDA claim corresponding to the TSP for this contract.

113. USAID also has paid some invoices for pre-termination costs late but failed to include the full amount of interest with the late payments. For example, USAID paid LINC's Voucher # 35 for its Ghana MEL contract (No. 72064122F00005) seven months late; however, USAID did not pay the full amount of interest owed for that late payment under the Prompt Payment Act. USAID owes interest to LINC for the late payments.

114. The FAR also permits contractors to submit vouchers for the payment of invoices until "the last day of the sixth month following the month in which the termination" of a contract "is effective." FAR 49.302(a). Once the contractor ceases submitting costs via voucher, the contractor must submit a TSP that "cover[s] unvouchered costs and any proposed fee." *Id.* at 49.303-1.

115. Plaintiffs SSG-Advisors, LLC, Bixal, and LINC submitted vouchers during the applicable 6-month post-termination period specified in FAR 49.302(a). USAID has either not responded, has responded but made no determination, or has rejected these vouchers.

116. For vouchers that were rejected, USAID did not reject them because they were improper, but instead because they were for post-termination costs. USAID's rejection of the vouchers on this basis is contrary to the FAR, which permits contractors to continue to submit costs via voucher until the end of the sixth month following the month in which the contract was terminated.

117. Many of the vouchers submitted during the relevant six-month period that were rejected were already past their due date under the Prompt Payment Act when they were rejected. Therefore, the vouchers had begun accruing interest under the Prompt Payment Act.

118. Plaintiffs are entitled to the costs included in the unpaid vouchers, plus Prompt Payment Act interest.

### E. The Government Owes Plaintiffs Significant Sums for Unpaid Termination Settlement Proposals

119. FAR 52.249-6(h) provides that, "[i]f the Contractor and the Contracting Officer fail to agree in whole or in part on the amount of costs and/or fee to be paid because of the termination of work," the Contractor Officer "shall pay" the Contractor specific costs as well as a portion of the fee payable under the contract.

120. Plaintiffs have submitted Termination Settlement Proposals (TSPs) for each of their terminated contracts, consistent with the requirements of the Federal Acquisitions Regulations (FAR) and the instructions in their termination notices.

121. The TSPs seek costs specified in FAR 52.249-6(h) according to the cost principles and procedures outlined in FAR chapter 31 and incorporated in Plaintiffs' contracts.

122. The government has significantly delayed the processing of Plaintiffs' TSPs. USAID has not fully resolved any of Plaintiffs' TSPs, even those that have been pending for more than one year.

123. As of today's date, all Plaintiffs have submitted TSPs that have not been resolved.

### F. Plaintiffs Have Suffered Multiple Forms of Damages from the Suspension and Termination of Their Contracts

124. The breaches of contract by USAID in stopping or suspending Plaintiffs' work under their contracts, and in then terminating the contracts, have caused Plaintiffs significant damages.

125. The unlawful terminations of Plaintiffs' contracts have resulted in at least four different categories of damages.

126. First, the breaches of contract have substantially diminished the value of Plaintiffs' businesses. USAID contracts comprised all or a substantial portion of Plaintiffs' revenue, and the sudden termination of those contracts has threatened the entire livelihood of their businesses. Plaintiffs would not have suffered this lost business value absent USAID's mass termination of contracts, and these losses in value are a reasonably foreseeable consequence of the terminations. Plaintiffs therefore are entitled to recover the lost business value caused by the USAID contract terminations.

127. Second, the breaches deprived many Plaintiffs of their expected profits that they would have earned but for the breaches. Because lost business value necessarily encompasses lost profits resulting from individual contract terminations, these Plaintiffs also seek lost profits, not in excess of lost business value, but only to the extent they are deemed to be unable to recover lost business value.

128. Third, Plaintiffs have suffered damages from the loss of funds that Plaintiffs would have received for indirect costs but for the breaches, where Plaintiffs continued to incur those costs following the terminations. Plaintiffs have suffered out-of-pocket losses from having to cover these indirect costs, when they would have been able to use the funds awarded under the contracts to cover these costs. Plaintiffs' expectancy damages at a minimum include these amounts.

129. Fourth, Plaintiffs have suffered reliance damages that they are entitled to recover in the alternative to expectancy damages. Plaintiffs hired employees, entered leases, purchased software, and entered into other contracts in reliance on the government fulfilling its obligations under the contracts, and Plaintiffs have suffered out-of-pocket losses from these costs due to the agency's breach of the contracts.

### G. Plaintiffs Have Exhausted Administrative Remedies

130. Plaintiffs have exhausted their administrative remedies by submitting claims under the Contract Disputes Act to their Contracting Officers to recover costs owed under the FAR and damages for breach of contract because of their contract terminations and unpaid interest under the Prompt Payment Act because of unpaid or late-paid invoices. Each Plaintiff has submitted the following claims:

*Bixal*

131. Bixal submitted CDA claims based on its TSP and invoice submissions and for additional damages for breach of contract.

132. After Bixal submitted a CDA claim based on its TSP and invoice submissions related to its Nepal Learning for Development contract (listed below), USAID made some payments on the TSP, reducing the total amount owed to Bixal on that contract under FAR 52.249-6.

133. Notwithstanding these partial payments, the Contracting Officer did not resolve, by the deadline required by the CDA, the CDA claim incorporating all of the amounts set forth in the TSP for that contract, and thus the CDA claim has been constructively denied.

134. Bixal submitted invoices with its TSPs for the full amount of unpaid costs included in the TSPs. Because the TSPs have not been resolved and the invoices have not been paid, Bixal's CDA claims for the amounts set forth in the TSPs included a demand for payment and interest under the Prompt Payment Act for the unpaid invoices.

135. Below are submission and response dates for Bixal's claims for each of its terminated contracts:

| Bixal | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Contract** | **Termination Date** | **Date TSP CDA Claim Submitted** | **TSP CDA Response Deadline Extended?** | **Response to TSP Claim?** | **Date Breach CDA Claim Submitted** | **Breach CDA Response Deadline Extended?** | **Response to Breach Claim?** |
| SERVIR Support Services, 7200AA22M00015 | 2/12/25 | 11/10/2025 | N | N | 2/18/2026 | N | N |
| Uganda MEL Task Order, 72061724F00001 | 2/12/25 | 11/6/2025 | N | N | 2/18/2026 | N | N |
| Laos MEL Support, 72043924F00002 | 2/26/25 | 11/10/2025 | N | N | 2/18/2026 | N | N |
| Ghana CREATES Activity, 72062424F00001 | 2/14/25 | 11/10/2025 | N | N | 2/18/2026 | N | N |
| Libya MEL Activity, 72067021F00001 | 2/26/25 | 11/10/2025 | N | N | 2/18/2026 | N | N |
| Nepal Learning for Development, 72036723N00002 | 2/26/25 | 11/10/2025 | N | N | 2/18/2026 | N | N |
| ESC MEL Services Activity, 72053822F00001 | 2/26/25 | 11/7/2025 | N | N | 2/18/2026 | N | N |

136. Each of Bixal's claims is ripe for this Court's review.

*Cloudburst*

137. Cloudburst submitted CDA claims based on its TSP submission and for additional damages for breach of contract. The Contracting Officer sought an extension to the response deadline for each of the claims.

138. The Contracting Officer attempted to extend the deadline to issue a final decision on these claims twice. On March 17, 2026, the Contracting Officer stated that he would issue a final decision by April 13. On April 14, the Contracting Officer stated that he would issue a final

decision by June 15. On June 15, the Contracting Officer stated that he would issue a final decision by August 15.

139. The second and third extensions were not permissible under the statute.

140. The Contracting Officer issued a final decision denying the claim for breach of contract but has not issued a final decision on the claim based on the TSP. On August 11, 2026, Cloudburst received a proposed contract modification to settle the TSP claim, but the proposed modification included an extensive waiver of all claims relating to the contract, including the breach of contract claims for which Cloudburst submitted a separate CDA claim, and Cloudburst is unwilling to agree to this waiver. On information and belief, USAID has required all contractors to agree to such a waiver before paying the contractor the full amounts owed on their TSP. Cloudburst's CDA claim based on the TSP has therefore been constructively denied.

141. Recently, Cloudburst's Contracting Officer issued a partial payment of outstanding "settlement costs" included in Cloudburst's TSP. Before issuing the partial payment, the Contracting Officer cautioned: "[P]lease be aware that as your TSP is still pending comprehensive review, receipt of a partial payment does not constitute any final allowability determination by the Contracting Officer."

142. Below are submission and response dates for Cloudburst's claims for its terminated contract:

| **Cloudburst** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Contract** | **Termination Date** | **Date TSP CDA Claim Submitted** | **TSP CDA Response Deadline Extended?** | **Response to TSP Claim?** | **Date Breach CDA Claim Submitted** | **Breach CDA Response Deadline Extended?** | **Response to Breach Claim?** |
| Democracy, Governance, and Human Rights (DRG); Learning, Evaluation and Research (LER III), 7200AA23M00011 | 2/11/25 | 1/27/2026 | Y: 4/13/26 **attempted to extend again | Y: contract modification with waiver on 8/11/2026 | 1/27/2026 | Y: 4/13/26 **attempted to extend again | Y: denied on 7/20/26 |

143. Each of Cloudburst's claims is ripe for this Court's review.

*Khulisa*

144. Khulisa submitted CDA claims based on its TSP submissions and for additional damages for breach of contract. The Contracting Officer sought an extension to the response deadline for all of Khulisa's claims.

145. After Khulisa submitted its CDA claim based on its TSP submission related to the SUN LE contract (listed below), Khulisa updated the TSP to remove certain costs that were deemed unallowable and others that were pre-termination costs and thus were submitted by invoice instead of through the TSP. Khulisa has notified the Contracting Officer that the total amount in the CDA claim based on the TSP is adjusted to the same extent as the underlying TSP.

146. The extended deadline to issue a final decision on each of Khulisa's claims has passed, and the Contracting Officer has not issued a final decision on any of Khulisa's claims. Therefore, the claims have been constructively denied.

147. Recently, Khulisa's Contracting Officer issued emails to Khulisa indicating that Khulisa's TSPs were eligible for partial payments of outstanding "settlement costs." Before issuing the partial payments, the Contracting Officer cautioned: "[P]lease be aware that as your

TSP is still pending comprehensive review, receipt of a partial payment does not constitute any final allowability determination by the Contracting Officer." Khulisa issued partial settlement payment invoices to USAID on May 28, 2026 for Contract 72061119C00003, and on July 28, 2026 for Contract 7200AA20D00016 (IDIQ)/72062422F00001 (Task Order). Khulisa received a partial settlement payment for Contract 72061119C00003 on July 10, 2026.

148. Below are submission and response dates for Khulisa's claims for its terminated contracts:

| **Khulisa** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Contract** | **Termination Date** | **Date TSP CDA Claim Submitted** | **TSP CDA Response Deadline Extended?** | **Response to TSP Claim?** | **Date Breach CDA Claim Submitted** | **Breach CDA Response Deadline Extended?** | **Response to Breach Claim?** |
| Scaling Up Nutrition Learning and Evaluation (SUN LE), 72061119C00003 | 2/26/25 | 3/18/2026 | Y: 7/19/26 | N | 3/19/2026 | Y: 7/19/26 | N |
| Peace Through Evaluation Learning and Adaptation II (PELA II), 72062422F00001 | 2/12/25 | 3/18/2026 | Y: 7/19/26 | N | 3/19/2026 | Y: 7/19/26 | N |

149. Each of Khulisa's claims is ripe for this Court's review.

*LINC*

150. LINC submitted CDA claims based on its TSP submissions and for additional damages for breach of contract. The Contracting Officer sought an extension to the response deadline for all of LINC's claims.

151. Before the extended deadline, the Contracting Officer issued a final decision on four of LINC's CDA claims based on breach of contract. The Contracting Officer has not issued a final decision on the remaining two claims based on breach of contract. Nor has the Contracting Officer issued a final decision on the CDA claims based on LINC's TSP submissions. Therefore, the claims have been constructively denied.

152. Recently, LINC's Contracting Officer issued partial payments of outstanding "settlement costs" included in each of LINC's TSPs. Before issuing the partial payments, the Contracting Officer cautioned: "[P]lease be aware that as your TSP is still pending comprehensive review, receipt of a partial payment does not constitute any final allowability determination by the Contracting Officer."

153. Below are submission and response dates for LINC's claims for its terminated contracts:

| **LINC** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Contract** | **Termination Date** | **Date TSP CDA Claim Submitted** | **TSP CDA Response Deadline Extended?** | **Response to TSP Claim?** | **Date Breach CDA Claim Submitted** | **Breach CDA Response Deadline Extended?** | **Response to Breach Claim?** |
| Ethiopia RLA, 7200AA20F00009 | 2/12/25 ; rescinded on 3/6/25; subsequent termination on 3/11/25 | 2/11/2026 | Y: 8/10/26 | N | 2/11/2026 | Y: 8/10/26 | N |
| Ghana MEL, 72064122F00005 | Termination letter 2/26/25; period of performance ended 3/18/2026 | 2/11/2026 | Y: 8/10/26 | N | 2/11/2026 | Y: 8/10/26 | Y: denied on 5/5/26 |
| Mexico MESA, 72052322F00003 | 2/26/25 | 2/11/2026 | Y: 8/10/26 | N | 2/11/2026 | Y: 8/10/26 | Y: denied on 5/5/26 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PLR LEES, 7200AA23F00010 | 2/26/25 | 2/11/2026 | Y: 8/10/26 | N | 2/11/2026 | Y: 8/10/26 | Y: denied on 5/5/26 |
| Georgia CCLA, 72011425C00001 | 2/26/25 | 2/11/2026 | Y: 8/11/26 | N | 2/11/2026 | Y: 8/11/26 | N |
| Kenya IGAPP Evaluation, 72061523F00001 | 2/26/25 | 2/11/2026 | Y: 8/10/26 | N | 2/11/2026 | Y: 8/10/26 | Y: denied on 5/5/26 |

154. LINC also submitted a claim for unpaid interest on an untimely paid invoice under the Prompt Payment Act. Although USAID paid the invoice more than seven months late, the agency did not pay the interest required under the Prompt Payment Act. Details about the claim are below:

| **Contract** | **Voucher #** | **Invoice due date** | **Invoice paid?** | **Interest Paid?** | **Date CDA claim submitted** | **Response to CDA claim?** |
|---|---|---|---|---|---|---|
| Ghana MEL, 72064122F00005 | 35 | 8/13/25 | Y, on 2/18/26 | N | 3/27/26 | N |

155. Each of LINC's claims is ripe for this Court's review.

*MCI*

156. MCI submitted CDA claims based on its TSP submission and for additional damages for breach of contract.

157. The Contracting Officer has not issued a final decision or extended the deadline to respond to MCI's claims within the time period prescribed by the CDA. Therefore the claims are constructively denied.

158. Below are submission and response dates for MCI's claims for its terminated contract:

| **MCI** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Contract** | **Termination Date** | **Date TSP CDA Claim Submitted** | **TSP CDA Response Deadline Extended?** | **Response to TSP Claim?** | **Date Breach CDA Claim Submitted** | **Breach CDA Response Deadline Extended?** | **Response to Breach Claim?** |
| Inclusive Development Activity for Mission Support (IDAMS), 7200AA22F00016 | 2/12/25 | 4/21/2026 | N | N | 4/21/2026 | N | N |

159. Each of MCI's claims is ripe for this Court's review.

<u>*NUMARK*</u>

160. NUMARK submitted CDA claims based on its TSP submissions and for additional damages for breach of contract.

161. The Contracting Officer has not issued a final decision or extended the deadline to respond to NUMARK's claims within the time period prescribed by the CDA. Therefore, the claims are constructively denied.

162. Recently, NUMARK's Contracting Officer issued partial payments of outstanding "settlement costs" included in NUMARK's TSPs. Before issuing the partial payments, the Contracting Officer cautioned: "[P]lease be aware that as your TSP is still pending comprehensive review, receipt of a partial payment does not constitute any final allowability determination by the Contracting Officer."

163. Below are submission and response dates for NUMARK's claims for its terminated contracts:

| NUMARK | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Contract** | **Termination Date** | **Date TSP CDA Claim Submitted** | **TSP CDA Response Deadline Extended?** | **Response to TSP Claim?** | **Date Breach CDA Claim Submitted** | **Breach CDA Response Deadline Extended?** | **Response to Breach Claim?** |
| Laos Energy Security Activity (LES), 72048620F00003 | 3/11/25 | 4/6/26 | N | N | 4/6/26 | N | N |
| Pakistan Power Sector Improvement Activity (PSIA), 72039121F00005 | 2/26/25 | 4/6/26 | N | N | 4/6/26 | N | N |

164. Each of NUMARK's claims is ripe for this Court's review.

*Panagora*

165. Panagora submitted CDA claims based on its TSP submissions and for additional damages for breach of contract.

166. The Contracting Officer has not issued a final decision or extended the deadline to respond to Panagora's claims within the time period prescribed by the CDA. Therefore, the claims are constructively denied.

167. Recently, Panagora's Contracting Officer invited Panagora to submit vouchers for partial payments of outstanding "settlement costs" included in Panagora's TSPs. The Contracting Officer cautioned: "[P]lease be aware that as your TSP is still pending comprehensive review, receipt of a partial payment does not constitute any final allowability determination by the Contracting Officer." Panagora submitted vouchers for each of its five contracts in July but received payment on only one voucher.

168. Below are submission and response dates for Panagora's claims for its terminated contracts:

| Panagora | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Contract** | **Termination Date** | **Date TSP CDA Claim Submitted** | **TSP CDA Response Deadline Extended?** | **Response to TSP Claim?** | **Date Breach CDA Claim Submitted** | **Breach CDA Response Deadline Extended?** | **Response to Breach Claim?** |
| Colombia Monitoring, Evaluation and Learning Short-Term Activity (MELSA), 72051423F00001 | 2/26/25 | 5/18/26 | N | N | 5/18/26 | N | N |
| Indonesia Monitoring, Evaluation, and Learning Platform (MEL-P), 72049720Q00001 | 2/26/25 | 5/18/26 | N | N | 5/18/26 | N | N |
| Strengthening Transformative and Equitable Partnerships (STEP) Activity, 7200AA24F00009 | 2/26/25 | 5/18/26 | N | N | 5/18/26 | N | N |
| Southern Africa Technical Support Services, 72067419C00001 | 2/11/25 | 5/18/26 | N | N | 5/18/26 | N | N |
| Localize Global Health Security (LGHS) Activity, 7200AA23C00056 | 2/26/25 | 5/20/26 | N | N | 5/20/26 | N | N |

169. Each of Panagora's claims is ripe for this Court's review.

*SSG-Advisors, LLC*

170. SSG-Advisors, LLC submitted CDA claims based on its TSP submissions and for additional damages for breach of contract.

171. The Contracting Officer has not issued a final decision or extended the deadline to respond to SSG-Advisors, LLC's claims within the time period prescribed by the CDA. Therefore, the claims are constructively denied.

172. Recently, SSG-Advisors, LLC's Contracting Officer issued partial payments of outstanding "settlement costs" included in SSG-Advisors, LLC's TSPs for some of its procurement contracts; SSG-Advisors, LLC is waiting on promised partial payments for several more procurement contracts. Before issuing the partial payments, the Contracting Officer cautioned: "[P]lease be aware that as your TSP is still pending comprehensive review, receipt of a partial payment does not constitute any final allowability determination by the Contracting Officer."

173. Below are submission and response dates for SSG-Advisors, LLC's claims for its terminated contracts:

| **SSG-Advisors, LLC** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Contract** | **Termination Date** | **Date TSP CDA Claim Submitted** | **TSP CDA Response Deadline Extended?** | **Response to TSP Claim?** | **Date Breach CDA Claim Submitted** | **Breach CDA Response Deadline Extended?** | **Response to Breach Claim?** |
| MAPS-H, 7200AA21C00053 | 2/26/25 | 4/22/26 | N | N | 5/8/26 | N | N |
| MAP BPA LPA Call Order, 7200AA23F50032 | 2/26/25 | 4/22/26 | N | N | 5/8/26 | N | N |
| MAP BPA DEIA Call Order, 7200AA22F50016 | 1/22/25 | 4/22/26 | N | N | 5/8/26 | N | N |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| MAP/Asia Call Order, 7200AA24F50039 | 2/26/25 | 4/22/26 | N | N | 5/8/26 | N | N |
| MAP BPA OPI, 7200AA24F50040 | 2/26/25 | 4/22/26 | N | N | 5/8/26 | N | N |
| MAP BPA Iraq CM Call Order, 72026724F50002 | 2/26/25 | 4/22/26 | N | N | 5/8/26 | N | N |
| MAP Laos, 72043924F50002 | 2/26/25 | 4/22/26 | N | N | 5/8/26 | N | N |
| USAID/BER-IKAN, 72049722C00001 | 2/26/25 | 4/22/26 | N | N | 5/8/26 | N | N |
| USAID/DEMD, 7200AA19M00016 | 2/26/25 | 4/22/26 | N | N | 5/8/26 | N | N |

174. Each of SSG-Advisors, LLC's claims is ripe for this Court's review.

175. SSG-Advisors, LLC's cooperative agreements are not subject to the Contract Disputes Act's exhaustion requirement for procurement contracts. SSG-Advisors, LLC's claims challenging the termination of its cooperative agreements are thus ripe for review in this Court without the submission of CDA claims to the CO on those agreements.

## CAUSES OF ACTION

### Count One
### Failure to Process and Pay Termination Settlement Proposals

176. Plaintiffs re-allege each and every allegation set forth in paragraphs 1–175 as if set out fully herein.

177. USAID terminated Plaintiffs' procurement contracts through notices of termination for convenience under FAR 52.249-6.

178. Plaintiffs submitted final TSPs to their Contracting Officers seeking costs to which they are entitled following the terminations for convenience under FAR 52.249-6(f), (h).

179. The TSPs have languished as USAID officials have failed to respond, required contractors to resubmit their TSPs to different contracting officers, required updates to TSPs based on changing guidance, and otherwise delayed paying out Plaintiffs' allowable termination costs. For each TSP at issue, the Plaintiff and its Contracting Officer have not agreed on all costs and fees due as a result of the termination. FAR 52.249-6(h) therefore requires the Contracting Officer to determine, based on the information available, the amount due and to pay that amount. The Contracting Officers have failed to do so.

180. Plaintiffs have submitted to their Contracting Officers CDA claims requesting a final decision on the costs requested in their TSPs.

181. The claims are deemed denied because the Contracting Officers failed to resolve them within 60 days or by the date of the Contracting Officer's first extension. Accordingly, Plaintiffs' CDA claims on the TSP costs are ripe for decision by this Court.

182. Plaintiffs are entitled to payment on the amounts requested in the TSPs under FAR 52.249-6, plus interest under the CDA.

**Count Two**
**Failure to Timely Pay Invoices and Interest on Late Payments**

183. Plaintiffs re-allege each and every allegation set forth in paragraphs 1–175 as if set out fully herein.

184. The Prompt Payment Act requires the government to pay invoices within 30 days of receipt. 31 U.S.C. § 3903(a)(1)(B).

185. The government must pay interest on invoices that it fails to pay within the 30-day period. 31 U.S.C. § 3902.

186. USAID has failed to timely pay pre-termination invoices to Plaintiffs SSG-Advisors, LLC, Bixal, and LINC.

187. These Plaintiffs are entitled to payment on their invoices plus interest under the Prompt Payment Act. 31 U.S.C. § 3902(b).

188. USAID paid invoices submitted by LINC after the 30-day deadline passed but failed to include in those payments the full amount of interest owed under the Prompt Payment Act.

189. LINC is entitled to the unpaid interest, plus applicable interest penalty payments. 31 U.S.C. § 3902(c)(3).

190. LINC submitted a CDA claim to its Contracting Officers for failure to pay interest under the Prompt Payment Act.

191. The CDA claim has been pending for more than 60 days.

192. The Contracting Officers have constructively denied the claims by failing to timely respond. Accordingly, Plaintiffs' CDA claims on Prompt Payment Act interest are ripe for decision by this Court.

193. Plaintiff LINC is further entitled to interest under the CDA on the CDA claim submitted for unpaid interest on its invoice. 41 U.S.C. § 7109.

**Count Three**
**Abuse of Discretion**

194. Plaintiffs re-allege each and every allegation set forth in paragraphs 1–175 as if set out fully herein.

195. "The cases are legion establishing that where a contract affords discretion to the government, exercise of that discretion must be fair and reasonable, not arbitrary and capricious." *Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 637 (2020). Thus, even where a contract gives an agency wide discretion in terminating a contract, the government breaches a contract where it abuses its discretion in carrying out a termination. *JKB Sols. &*

*Servs., LLC v. United States*, 18 F.4th 704, 709 (Fed. Cir. 2021). And the government abuses its discretion where "the contracting officer's decision to terminate was arbitrary and capricious." *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 361 (2013).

196. USAID abused its discretion and acted arbitrarily and capriciously in terminating Plaintiffs' contracts. USAID terminated the contracts without any genuine individualized consideration, and instead as part of a mass termination of USAID contracts undertaken for impermissible and irrational reasons.

197. The Contracting Officers exercised no independent judgment in terminating USAID contracts, and neither the Contracting Officers nor any other agency official considered, let alone explained, how terminating any one of Plaintiffs' contracts was the appropriate course of action even assuming there were aspects of any contracts that the agency considered to be problematic. The agency instead issued identical or virtually identical, boilerplate termination letters to hundreds or thousands of other contract recipients.

198. The terminations were also arbitrary and capricious because USAID ignored important aspects of the problem, including how it would fulfill its statutory mandates upon terminating foreign assistance contracts *en masse*. By the same token, the agency failed to consider the relevant factors that Congress directed the agency to consider.

199. The terminations were also arbitrary and capricious because they were executed without regard to where in the performance or budget periods each contract's project fell and the extraordinary inefficiencies and high costs to the government resulting from terminating the contracts when many projects were well under way or even near completion. For a vast number of contracts, the government did not receive the value and benefits of the time and money the agency had already invested in the contract's performance.

200. Additionally, USAID did not address the serious reliance interests at stake or consider reasonable alternatives to termination. For instance, Plaintiffs made purchases and built out business capacity in reliance on funds they expected to receive for complete performance of their contracts and with the expectation that they would complete performance consistent with the terms of the contracts USAID has awarded them. Many Plaintiffs are now bound to contracts for office space, software, or other resources that were necessary to project performance but that they could not immediately cancel upon USAID's unexpected termination of their contracts. Some Plaintiffs are facing the potential extinction of their business following the termination of multiple or large USAID contracts that they were in the midst of performing. And the third party beneficiaries of Plaintiffs' projects, including foreign governments and constituents in need of life-saving foreign assistance, have been left, suddenly, without support. USAID failed to consider these and many other reliance interests when it terminated foreign assistance contracts *en masse*.

201. Accordingly, USAID abused its discretion in terminating Plaintiffs' contracts.

202. As a result of this breach of contract, Plaintiffs have incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

203. Plaintiffs have submitted to their Contracting Officers CDA claims for breach of contract damages based on the government's arbitrary and capricious conduct.

204. The CDA claims have been pending for more than 60 days.

205. The Contracting Officers have either outright denied the claims or constructively denied the claims by failing to timely respond. Accordingly, Plaintiffs' CDA claims for breach of contract are ripe for decision by this Court.

206. Plaintiffs are entitled to payment on the damages requested in the CDA claims and interest under the CDA.

**Count Four**
**Breach of the Covenant of Good Faith and Fair Dealing**

207. Plaintiffs re-allege each and every allegation set forth in paragraphs 1–175 as if set out fully herein.

208. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Const. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 205 (1981)). Courts have "long applied those principles to contracts with the federal government." *Id.*

209. The covenant of good faith and fair dealing "imposes obligations on both contracting parties that include the duty not to interfere with the party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1238, 1304 (Fed. Cir. 2005)).

210. Where a contract confers discretion on a party, the implied covenant of good faith and fair dealing "limits the manner in which [the] party . . . may exercise it by requiring that party to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691, 705–06 (1996) (citation omitted); *see also Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 638 (2020) (plaintiff's "allegations of arbitrary and capricious agency conduct" supported its "claim for breach of the implied duty of good faith and fair dealing"). This requires that an exercise of discretion "be done honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of such power." *Orange Cove Irr. Dist. v. United States*, 28 Fed. Cl. 790, 800–01 (1993).

211. USAID acted to destroy Plaintiffs' reasonable expectations when entering into contracts with each of them. Plaintiffs could not have reasonably expected that USAID would unilaterally terminate the contracts without warning as part of a mass termination of USAID foreign assistance projects. Prior to 2025, neither USAID nor any other federal agency had ever carried out a mass termination of contracts agency-wide. Plaintiffs could not have reasonably expected that USAID would have indiscriminately terminated their contracts as part of a mass-termination effort without giving individualized consideration to the merits of the projects that USAID had contracted them to perform. Plaintiffs certainly could not have anticipated that the mass terminations would have been carried out as part of an effort to gut the agency and prevent it from carrying out its statutorily assigned functions.

212. USAID also acted arbitrarily and capriciously in terminating Plaintiffs' contracts for all the reasons explained above. USAID did not provide a reasoned explanation for the terminations, did not cite a valid basis to terminate the contracts, did not consider factors that Congress required it to consider, did not address the serious reliance interests at stake, and did not consider reasonable alternatives to termination. Nor did the agency consider how it would carry out its statutorily assigned functions after terminating foreign assistance contracts *en masse*.

213. Accordingly, USAID breached the implied covenant of good faith and fair dealing.

214. As a result of such breach, Plaintiffs have incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

215. Plaintiffs have submitted to their Contracting Officers CDA claims for breach of contract damages based on the government's breach of the covenant of good faith and fair dealing.

216. The CDA claims have been pending for more than 60 days.

217. The Contracting Officers have either outright denied the claims or constructively denied the claims by failing to timely respond. Accordingly, Plaintiffs' CDA claims for breach of contract are ripe for decision by this Court.

218. Plaintiffs are entitled to payment on the damages requested in the CDA claims and interest under the CDA.

**Count Five**
**Bad Faith**

219. Plaintiffs re-allege each and every allegation set forth in paragraphs 1–175 as if set out fully herein.

220. "It is an established principle that the government is not permitted to terminate a contract in bad faith, even if the contract gives it the ability to terminate with impunity." *Irwin Cnty. v. United States*, 170 Fed. Cl. 355, 370 (2024). "Bad faith" includes "any conduct that evinces a 'specific intent to injure' and 'animus' toward the opposing party in terminating the contract." *Id.*; *see also Dekatron Corp. v. United States*, 128 Fed. Cl. 115, 118 (2016) (bad faith includes "specific intent to injure" or "animus").

221. Animus toward a defined group of contractors can support a bad faith claim where the government acts against members of that group because of a shared, disfavored characteristic. *See Danziger v. United States*, 181 Fed. Cl. 93, 98 (2026) (certifying class of former USAID contractors pursuing bad faith claims).

222. Senior Administration officials expressed overt animus toward implementing partners for foreign assistance activities, including Plaintiffs. President Trump declared that the "United States foreign aid industry and bureaucracy" were "antithetical to American values" and served to "destabilize world peace." Elon Musk declared that "USAID is a criminal organization" and it was "[t]ime for it to die." He spread false and pernicious claims about USAID's implementing partners, including that they did not deliver aid to local communities. He wrote "True" in response to a social media post claiming that "USAID has been sending money to George Soros NGOs, he then uses that money to FUND AND TRAIN PROTESTERS."[5] He said that USAID "funded bioweapon research, including COVID-19, that killed millions of people."[6] These comments are only the tip of the iceberg of Musk's animus-laden comments regarding USAID programs and the partners carrying them out.

223. USAID, DOGE, and other administration officials translated this animus into action in terminating Plaintiffs' procurement contracts. Political appointees and DOGE personnel directed USAID to terminate awards at lightning speed, without any regard to the effect those actions would have on implementing partners and their employees around the globe who were in the midst of performing their awards.

224. USAID's termination notices demonstrate that the asserted grounds were pretextual, which further supports an inference of animus. USAID issued boilerplate notices in large tranches, sometimes addressed merely to "Recipient" or "Implementing Partner," and at times communicated with the wrong organization. USAID generically cited the "national interest" as a basis for termination, without any individualized consideration of specific contracts

---

[5] @ElonMusk, x.com (June 23, 2026), https://x.com/elonmusk/status/2069535856491483484?lang=en.
[6] Elizabeth Chuck, *What is USAID? How it works and what could happen if Trump and Musk shut it down*, NBC News, https://perma.cc/AJ34-P8Y7.

and whether they in fact promoted the national interest. These generic, boilerplate rationales suggest that USAID was merely grasping for rationalizations for its decisions to target the contractors.

225. The timing further supports this conclusion. After recipients sought emergency relief in district court, USAID leadership directed Contracting Officers to "move quickly" to terminate identified tranches of awards, with deadlines of the same day or the next day.

226. USAID terminated Plaintiffs' awards with animus toward them as members of the foreign aid community and with a specific intent to injure Plaintiffs and destroy the programs and communities they serve. Because USAID acted with animus and a specific intent to injure, USAID acted in bad faith and breached Plaintiffs' contracts.

227. As a result of Defendant's conduct, Plaintiffs have incurred substantial monetary damages, plus interest and costs and expenses, as well as legal fees.

228. Plaintiffs have submitted to their Contracting Officers CDA claims for breach of contract damages based on the government's bad faith conduct.

229. The CDA claims have been pending for more than 60 days.

230. The Contracting Officers have either outright denied the claims or constructively denied the claims by failing to timely respond. Accordingly, Plaintiffs' CDA claims for breach of contract are ripe for decision by this Court.

231. Plaintiffs are entitled to payment on the damages requested in the CDA claims and interest under the CDA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against the United States in the amount of Plaintiffs' damages, or such other amount as to be

proven at trial, as well as costs, expenses, fees, interest, and such further and other relief as the Court deems just and proper.

Dated: August 17, 2026

Respectfully submitted,

/s/ *Daniel F. Jacobson*

Daniel F. Jacobson (D.C. Bar # 1016621)
Stephen K. Wirth (D.C. Bar # 1034038)
Brian C. Rosen-Shaud (D.C. Bar # 90042065)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com
stephen@jacobsonlawyersgroup.com
brian@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*